Robert Rexrod for the appellant, Mike Waseleski. It's a tough name. It was tough at trial, and it still is. With the panel's permission, I'd like to touch briefly on what I believe demonstrates that the government chose to allege one gigantic conspiracy and yet prove several smaller conspiracies at trial and then focus on why that prejudiced my client. I think the first thing to look at in terms of the variance here is just the simple length of the conspiracy alleged by the government. It's between four and five years. And I understand that a length of a conspiracy is not dispositive. But just as a matter of common sense, it's kind of hard to keep an agreement going for four years as opposed to four months. This was quite a lucrative agreement. For some, yes. But again... It's also quite interesting as well. It was different than many cases, I think. I noticed they didn't go to Vegas, though. They did not. Perhaps one of the only smart things they did. But again, I mean, just the sheer length, I think, indicates that these are episodical conspiracies to cheap casinos across the country. And I understand Babero's there, but that is the longest conspiracy that I could find in the case law. And what's unique about that is Babero discusses a very consistent criminal act, which is bringing a boat with marijuana offshore, either in Oregon, Maine, or California, but it's always offshore, and then smaller boats unloading it and bringing it into shore. That's repeated over and over again in Babero. You can see why that would be an ongoing conspiracy. That's factually just very different than what happened in what the government alleged. Is it, though? Is it? I mean, this seemed pretty consistent, that they would target a casino. You couldn't hit the same casino for four years because of the detection mechanism. Sooner or later, their suspicions are going to be raised. But it's pretty close to the same M.O. throughout the period, the asserted period of the conspiracy, isn't it? I think there are some fundamental differences as the years go by. Primarily, it's three years into this meta-conspiracy before they decide to target Blackjack as opposed to Minnie Baccarat. You can look at that, oh, that's just a different card game in a casino. But when you look at the method by which they cheated Blackjack, it's very different than Baccarat. It had to be because of the different natures of the games. Because in Baccarat, you can actually legitimately keep the score when you're playing. But in Blackjack, card counting is against the rules. So they had to alter their M.O. just to take into account the rules for the games. But is that significant enough to mean that it's a different conspiracy? I do. I do think it's significant enough because the actual method they use, and you're absolutely correct about the nature of the game. But all of a sudden, three years into this conspiracy, it's not that we're just going to target a new game. We need more people on the table. Not only do we need that. We need electronics. The government made a big deal at trial. They put into evidence this little earpiece that they had. Not only that, but they have to now. Because of the nature of the game, because they couldn't keep track legally of the card counting in Blackjack, then they needed somebody to tell them what the cards were when they got to the slug or whatever it's called. Yes. The slug was actually in Baccarat, I believe, mini Baccarat. In Blackjack, oh, they didn't use that? Yeah, they had to. I'm not going to say one way or the other. I don't recall. Oh, you don't want to say. Okay, I'll say it. No, because I'm saying you're right. Otherwise, they wouldn't know what cards were coming up if they didn't know that they were getting to the point where they were going to use the same cards again. But I do want to return to my point. I think just the use of technology. I mean, now they have people off-site. I mean, this might be a good way to look at it from my perspective. In 2002, when this whole thing started, it began at a casino called Cash Creek, and I show the difference in my opening brief. There's a gentleman named Martin Aronson who's a dealer at Cash Creek, and he's a corrupted dealer in 2002. By the time they start targeting Blackjack, Martin Aronson's not a corrupted dealer. Martin Aronson is developing software to count cards. Martin Aronson is the man behind the screen. He's evolved. Yes. Not only evolved, it's a completely different crime to my way of thinking. I mean, we can pigeonhole, you know, they targeted casinos. But maybe I was a little flippant in my briefs, but that's where the money is. Bottom line, it's a casino cheating ring. Yes. You know, it's not like they went to smuggling drugs or robbing banks. At bottom, it remained, you know, cheating casinos at games of chance. Yes. But given the way the cheats developed, changed, given how they were done, I don't—we could make a conspiracy out of pretty much anything, as long as, you know, you only sold drugs, you only robbed banks. I mean, you know, bank robbing crew is probably a pretty good example. I mean, there's—Willie Sutton didn't conspire his whole adult life to rob banks. I'm pretty confident of that. But he was a bank robber. I mean, he just went to banks because that's where the money was. And I think— Each one is, in fact, you know, specific, but it's—I mean, if this, you know, generally the same people are involved, especially at the top, and you have the same basic M.O., and you have the same target, it's hard to say that it's not a continuing conspiracy. I would—with true respect, I would disagree with a couple of those statements. Okay. Agree that there are key participants, and there's no way around it, but there is one huge key participant named Willie Tran who exits the group and creates his own little gang. It's not—it's not the same. And I think the best way to look at that is to look at the testimony of Son Johnson. Son Johnson was one of the cooperating witnesses. He began as a corrupted dealer in Cache Creek as well. And on cross-examination, he just said, we would target a casino. We would get a crew together. We would target that casino. Once we were done, we would go home, enjoy the winnings, as he described them, winnings, and then when they targeted another casino, they would get a group together. But isn't that the overall conspiracy? That is to—just as Judge Rawlinson said, is to, you know, to focus on— their agreement was to cheat casinos around the country. Yes. And what they—in order to do that, they had to attract people from the various casinos who understood what was going on. It's like, you know, they had this overall scheme, and then they would focus in on some place. Yes, but it wasn't a—it's not like these people were putting in 80-hour weeks. I think the import of Son Johnson's testimony is they conspired to cheat a casino. Call it whatever casino you want, a particular casino. When that cheat was done, that conspiracy ended. They went their separate ways, and then they got the gang back together for a new cheat. Are you—this is more like Oceans 11? Yes. And Oceans 13, right? My reference was not appreciated, I don't think, at the district court level. That's what you're arguing, right? Very much so. Yeah, they pulled the gang. Maybe it's not even particularly the same exact membership, but they— And— Separate movies. And the record is clear that it wasn't always the same gang. There were key participants, which I'm sure the government will focus on. There were maybe three or four people that were common throughout. But as I said, with Mr. Aronson, even their roles start changing. Well, if they were going to different casinos, they had to get people who were in the targeted casinos. And so the composition of the conspiracy had to change because they had to have insiders in whatever casino was targeted the next time. That doesn't make it a new conspiracy because they needed different people, depending on the casino, does it? To my mind, variances are kind of slippery. It's fact-driven. It's very hard to look at case law and say this is very similar to that. I think that sort of shows that these are different conspiracies. Because if you think back, if you and I are cheating a casino, and we agree, and we recruit a dealer, and we're done cheating, we go home, we waste our money because we're degenerate gamblers as well, and then you and I decide again, hey, let's go to another casino. We need to recruit some more people. That's not the same agreement that we had before. That's a brand-new agreement. It's the same agreement, different people. Like I said, it's slippery. I think it's a new agreement. The new agreement is, hey, do you want to rob Cache Creek Casino? Yes, I would. Let's go do that. Done. Spend the money. Call you back up. Do you want to go rob this casino in Mississippi? Yes, new agreement. But if we look at the evidence in the light most favorable to the government, which we're doing on the sufficiency of evidence challenge, perhaps that's one way to look at it. But also one could look at it as we agree to rob casinos across the country, and we'll have to get dealers at each casino that we intend to cheat or rob or whatever. So, I mean, why wouldn't it be fair to say that the jury could draw the inference that supports the conspiracy rather than drawing the conspiracy theory, drawing the inference that doesn't support the conspiracy theory that the government articulated? The difference is the state of the evidence, to my mind. There was never testimony, and I know I understand inferences, but if you could bear with me. There was never testimony either from Pai Gao John or Son Johnson that there was an initial agreement that we're going to barnstorm around the country robbing casinos. There is, in contrast, testimony by Son Johnson that these were episodical cheating ventures. So, I mean, I don't think the jury can draw an inference of an overall agreement when there's nothing to my mind to support it. The only commonality is they're robbing casinos. But the agreement doesn't have to be expressed. I mean, generally it isn't in conspiracy cases. So you look at the actions that were taken to draw an inference and see if that inference is fairly drawn by the jury. I agree. This is a little different. I mean, not every conspiracy case I've had has four cooperating witnesses. There were people who were more than willing to or would have been in a position to say, we have this great idea and we just kept going. And at the onset we agreed that we were going to form a crew and just keep going until we stopped. But that's not what they did. I mean, actually. Actually, that is what they did. They kept going until they stopped. Or were stopped. They kept going to different casinos. I mean, at ER 232, they target one casino on and off for three years. They keep going back to the same casino. There's another casino that they only target for three months. They're actually commuting cross-country at one point. They're cheating. I think it was in Mississippi. It's at ER 276. I think the casino was in Mississippi. And they're commuting. They're literally commuting to work from San Diego. That doesn't sound to me like the Cache Creek cheat. It just. May I ask you. Let's assume for a moment that we agree with you that this was a separate conspiracy involving Mr. Wasilewski. What is the prejudice in order to find a variance? I identified three potential, three different ways that it could have prejudiced Mr. Wasilewski. I'd like to focus on the jury instructions because it's actually. It's a confusing case. The way the government charged this case, this indictment, one of many indictments associated with this organization. What the government claims is one organization. The way they chose to charge this was a conspiracy to commit crimes against the United States. So because of that choice that the government made, the government had to prove that a crime was committed, whether it be state law or whatnot. The ones I referenced in my brief are, you know, possessing an interstate commerce, a certain amount of money. But there was no requirement that the jury had to find unanimously which crime was committed. Just the agreement, obviously, because it was a straight conspiracy charge. When you look at that and then you factor in the judge's instruction that a person who joins a continuing conspiracy is liable for past actions, there is a ton of past actions that were testified to, primarily by Son Johnson, that would have allowed a jury to say, yes, Son Johnson did X in 2003. And that meets the requirement of a law violation. Mr. Wasilewski joined this conspiracy in 2005. He's liable for Son Johnson's past behaviors. That's exactly how it happens. So I was trying to look at the sentence and to determine whether he was sentenced for things. They make a fairness argument that it wasn't fair to be sentenced for. I can't tell what the 15-month sentence was based on. But I did note that he was held jointly and severally liable for restitution to all these places, casinos and resorts, where he wasn't an actual participant. Would you argue that that's prejudice? I would love to argue that's prejudice. You can't? I don't think it's true. Okay. My recollection of the sentencing, and I was the counsel at sentencing, is that the restitution imposed on Mr. Wasilewski by Judge Houston was specific to the resorts casino. Really? I may be wrong. It says the following victims resorts, East Chicago Casino. And then it says Resorts International. So these are all owned by the same casino. It says Boardwalk Atlantic City, Federal Insurance Co. I know. I guess I'm confused about how this Atlantic City Hilton Hotel. Like I said, I'd love to be able to argue, but I don't think it's factually supported. It's all the same entity. It's all the same entity with the exception of the insurance company. Believe it or not, casinos have insurance against that. I didn't know that. And that insurance company actually paid out to resorts. Okay. I've got about two minutes left. I'd like to reserve you. You're actually over. Oh, I'm over. I did that last time I was here. Any other questions? You didn't learn. Nothing further? Thank you. Good morning, Your Honors. I may please the Court. John Pelletier on behalf of the United States. I'd just like to start by briefly responding to a point that the defense made regarding that related to the prejudice argument and the instructions. Mr. Rexrod argued that the jury had to find that the conspirators committed an offense but didn't have to be unanimous. And the law of conspiracy is not that they had to actually commit a substantive offense but agree to commit a substantive offense, a criminal object. And here we alleged and charged three criminal objects of the conspiracy, one being traveling interstate commerce to commit to engage in an illegal gambling business against state law, number two, transporting funds across state lines that had been stolen, and number three, receiving funds that had stolen funds that had crossed state lines. And the jury instructions were clear that the jury, you have to all agree as to a particular crime that the co-conspirators agreed to commit. So they have to be unanimous as to the object of a conspiracy. So that claim of prejudice doesn't stand up. And now I'd like to back up and talk about the single conspiracy. And Judge Rawlinson hit exactly upon the correct issue here, which is the legal standard that applies. This is a sufficiency issue. And the issue is whether the evidence taken in the light most amenable to the jury's verdict supports the conclusion, the jury's conclusion, that there was one conspiracy. Most conspiracies can be chopped up into smaller subagreements that could feasibly be charged as separate, smaller conspiracies. The question isn't whether the evidence can be interpreted in a manner that's amenable to finding such smaller conspiracies here. The question is whether the evidence can be interpreted in a manner that's amenable to finding one conspiracy as alleged in the indictment. And the evidence doesn't have to foreclose to finding that there were also some smaller subagreements. This Court's cases are clear on that in that regard. Now, the evidence of a single conspiracy is substantial. There were a common – there were a core group of participants, Pai Gow John, his wife Van Tran, Sun Hung Johnson, Willie Tran, Martin Aronson. There was a common objective, to steal money from casinos. Now, the defense argues that this is too general. But in the Arbelaez case, for example, the Court – the Court characterized the following as a perfectly permissible common goal of a conspiracy. All appellants were interested in distributing as much cocaine as possible to earn as much profit as possible. The conspiracy here was more unique than the conspiracy in Arbelaez. There's no requirement that a conspiracy be unique or obscure, the goals of the conspiracy. The attorney – and Mr. Wasilewski joined this larger conspiracy that occurred over this period of time. He joined in the common objectives of the conspiracy. He knew or had reason to know that the scope of the conspiracy and that the other participant that his – he benefited from the acts of other participants. Sun Hung Johnson told him, I've cheated many other – I've cheated at many other casinos. I'm very professional. Basically, to give Mr. Wasilewski comfort, to join the conspiracy. Mr. Wasilewski saw the fruits of the conspiracy at Pai Gao John's house in Houston, his house in San Diego, where he housed a stable of luxury cars with a vanity license plate, Pai Gao John, a medallion with a diamond and the – and the Mercedes sign. He saw the fruits of the conspiracy, knew this was a very successful and lucrative conspiracy. He knew that the cheat at Resource East was funded by these prior cheats. Two conspirators put down $40,000 each to buy chips to buy into the – to the Baccarat table. Mr. Wasilewski knew or had reason to know that those were the fruits of prior cheats. He had reason to know that there were other – there were other dealers at other He knew that there was Santana at his casino was also participating. In fact, he received money each time Santana engaged in a cheat. The evidence strongly and overwhelmingly established the single conspiracy alleged in the indictment and that Mr. Wasilewski joined in that conspiracy. Turning to prejudice, the – even if there – the evidence established a narrower conspiracy, namely a conspiracy to cheat only Resorts East and not the others, there's no prejudice. The Supreme Court in this court has recognized, I believe, four types of prejudice in these multiple object conspiracy cases, one being lack of notice. There was no lack of notice to the defense – to be able to prepare a defense. There was no lack of notice here. The indictment clearly alleged all of the facts that were presented at trial. There was no – there was no surprise. Number two is inability to plead double jeopardy in the future, and that simply doesn't arise when a conspiracy that's proved at trial is narrower than the conspiracy that's alleged in the indictment. And the Miller case from the Supreme Court discusses that. And those are the two types of prejudice discussed in the foundational Berger case from the Supreme Court in 1935, which – How about the spillover effect, as he was trying to argue? And Kadiakis expanded it into spillover, which – and recognized another potential area of prejudice. Now, the cases essentially recognize two types of potential spillover prejudice. One is essentially confusion, because there's so many defendants and they might mix up the evidence. That's not the – that could not have occurred here. There's only one defendant. And this Court has recognized that defendants in single defendant cases are not entitled to a multi-conspiracy instruction for that reason, because there's no – there's no danger of confusion. The other type of spillover prejudice is potentially the introduction of evidence that would not have been introduced at a trial on a smaller conspiracy. And that didn't occur here, because all of the evidence that was introduced at trial would have been introduced, even if the government had indicted Mr. Wasilewski on a smaller conspiracy only to – Why would all of that have come in, especially the other bad acts of the other co-conspirators? It's black-letter conspiracy or evidence law that the – that prior acts involving co-conspirators are admissible to show the background of the conspiracy, how it developed. But they were co-conspirators at the time of the prior bad acts. No. I don't think that's true. I think it's a background prior to the start of conspiracy. I think I would – this Court's case in Smith, which is cited in the brief, stands for that – another case that I can't remember off the top of my head. I believe those were prior dealings with a conspirator and either other co-conspirators or other non-co-conspirators to show the background to a conspiracy. And the 404B relates to the evidence used to show – of prior acts to show character, to show actions in conformity with that character. All the other acts evidence here had nothing to do with Mr. Wasilewski, so it didn't – it wasn't being used to show his acts here. See, that's the point. I think that counsel's meeting, all the other acts had nothing to do with him, and yet they all came into evidence as part of this grand conspiracy to make money from casinos. Yes, because there's a single conspiracy, and black-letter conspiracy law is that an individual can join a conspiracy at a later point in time. And so the evidence of the larger conspiracy is relevant to the conspiracy that he joined. That's assuming he joined a larger – you're assuming your argument to make that assertion. Taking into account the smaller conspiracy, assuming that the conspiracy started in 2005 when Pygow John approached Mr. Wasilewski, the evidence shows how this cheating mechanism developed, how they adopted and devised this method to do the false shuffle to get – But if it was a smaller conspiracy, some of that evidence, they could have raised a Rule 403 objection. Yes, they could have raised that, and I would say – and to be clear, the evidence of these other prior cheats in other casinos was not a huge part of this case. I looked over the record, and to my best count, there are 45 pages of a 600-plus transcript that deal with these prior cheats. And if you look at the government's closing arguments, there's basically no reliance on these prior cheats. I think there's one vague reference to the prior cheats. So, again, this was not a case where we were trying to inculpate Mr. Wasilewski based on the prior conduct of the other participants earlier. Another point that I just want to raise is that Mr. Wasilewski raises in his reply brief the standard that should apply regarding prejudice. He suggests that the standard for constitutional error should apply and that the court should have to prove beyond a reasonable doubt that there was no prejudice. That's against the weight of Supreme Court authority in this Court's cases and every case in every other circuit. No case – no court has ever held in a variance context that the constitutional standard applies. Every court, this Court, the Supreme Court, and Berger and Kariakis has applied the regular – the regular harmless error standard. And in fact, courts across the country, including this Court, have said that it's the defendant's burden to show a lack of prejudice, not the government's burden, under the regular harmless error standard. And I point to this Court's decision in United States v. Soto 1F3rd 920 at Penn Site 922 and United States v. Homick 964 F2nd 899. Unless the Court has additional questions, we'll rest on our brief. Okay. Thank you. Thank you. Do you want a minute more? I tried to leave it all in the brief. Unless the panel has any questions, I'm fine. Okay. Thank you. Thank you. Thank you very much. U.S. v. Wazilewski will be submitted in discussion of the court's approach. All rise. The Court will be presented at ten o'clock. Thank you. Thank you.
judges: Wardlaw, Paez, Rawlinson